# Wytheville.

## Freeman Stone and Gravel Company, Inc. v. Wight and Company, Inc.

June 12, 1930.

Absent, Campbell and Holt, JJ.

The opinion states the case.

*James G. Martin* and *James R. Machen*, for the plaintiff in error.

*Venable, Miller, Pilcher & Parsons*, for the defendant in error.

BROWNING, J., delivered the opinon of the court.

This is a case which involves an alleged agreement between the parties thereto of August, 1927. The plaintiff in error is here complaining of the action of the trial court in setting aside a verdict of the jury in its favor for the sum of $1,479.96, and entering final judgment for the defendant in error.

The parties hereafter will be referred to as plaintiff and defendant, the relation borne by them in the trial court.

The material facts in the case were as follows: The plaintiff had previously been engaged by the defendant as its agent for the sale of slag in the vicinity of Norfolk. Mr. Wight agent of the defendant company, had occasion, in the early part of August, 1927, to confer, in Princess Anne county, with Mr. Freeman, agent of the plaintiff, as to certain sales claimed to have been made by him. During a casual conversation, the defendant's agent informed the plaintiff's agent that his company had bid upon a certain project before the Highway Commission, which concerned the furnishing to the said Commission some 13,000 tons of what was known as run of bank slag. Mr. Wight stated that his company's bid in connection with the then existing high freight rate from the point of production on the Chesapeake and Ohio Railway to the place of de-

livery in Princess Anne county, rendered the transaction of little profit to his company. Mr. Freeman replied by asking Mr. Wight why he did not get the freight rate reduced to the figure which obtained on like material being shipped to other points in the same vicinity, and to which the distance was no greater. Mr. Wight said that he had made efforts to effect this change but without success, whereupon Mr. Freeman assured him that he could have the reduction in the freight rate made and if he did so, what it would mean to him in the matter of compensation. Mr. Wight said that he would divide with the plaintiff the saving made in the deal with the Highway Commission. Thereupon, the plaintiff interviewed F. H. Wilson, general agent of the Chesapeake and Ohio Railway Company at Norfolk, which company would be the initial carrier of the material in the event that the bid was accepted by the Commission. Pursuant to this, Mr. Wilson phoned the Norfolk and Southern Railway Company, which would be the delivering carrier, with reference to the matter, with the response from that company, that it saw no reason why the change in the rate should not be effected. A short time thereafter Mr. Wight talked to Mr. Fitzgerald, the general freight agent of the Chesapeake and Ohio Railway in Richmond about the matter. The result of the said interview was a letter by Mr. Fitzgerald to Mr. Dalton, general freight agent of the Norfolk and Southern Railway Company, which letter of August 8, 1927, is designated in the record as Exhibit 2, the substance of which was the information that the writer was preparing a proposal suggesting the establishment of the rate desired and stating in effect that such suggestion was in response to a request from Mr. W. H. Freeman, of plaintiff's firm. A copy of this letter was

enclosed with the letter of F. H. Wilson, the general agent of the Chesapeake and Ohio Company, at Norfolk, of August 10, 1927, to Mr. W. H. Freeman, the copy being sent to Freeman for his information.

In our view of the evidence here ended any effectual efforts of the plaintiff toward the accomplishment of the purpose of the agreement. The evidence clearly shows that the project of the Highway Commission for the quantity and character of the material, which was in the minds of the parties at the time of the agreement, never materialized. The bid of the defendant was never accepted by the Commission because the character of the material could not be profitably used by the Commission, because of the large percentage of waste material and the possible involvement of the Commission with the owners of commercial sand banks of the probability of this waste material being washed upon said sand banks and causing injury thereto.

The Commission revised its call for bids requiring a better quality of material, because coarser, which in turn necessitated the screening of the run of bank slag, which could only be done at an additional expense to the bidder of approximately twenty cents per ton. The defendant interviewed Mr. Shirley, Chairman of the Commission, and acquainted him with the fact that the project would be almost profitless to his company unless a change in the existing freight rate could be procured. Mr. Shirley took the matter up with Mr. A. P. Gilbert, freight traffic manager of the Chesapeake and Ohio Railway, with the said purpose in view.

Let us here say that prior to the Shirley-Gilbert interview, efforts had been made by both of the carriers referred to to get the consent of the Southern Freight Association, an organization of railway officials, whose

consent in such matters had to be obtained, or the carriers, reserving the right of independent action, might exercise such right, which appeared to be a case of last resort.

The said association declined to approve the desired rate of $1.65 per ton and also declined to approve another rate of $1.75 per ton, thus the connection of the said association with the matter ended. With reference to the connection of the Chairman of the Commission with the matter as the procuring cause of the rate being finally changed, we quote from the testimony of the witness, Mr. A. P. Gilbert:

Q. "Tell the jury how this matter came to your attention and what your record shows had been done before and what you did about it, and at whose instance?

A. "I cannot recall definitely when Mr. Shirley, of the Highway Commission, came in to see me.

Q. "What is Mr. Shirley's position with the Highway Commission?

A. "He is the head of it.

Q. "You mean the Virginia Highway Commission?

A. "The Highway Commission of Virginia, yes, sir. He came in to see me and made certain representations about the troubles he was having in getting his slag down here to the Inlet. I think it was Inlet, Virginia, on the Norfolk Southern Railroad. He represented the situation as very serious and I called for the papers, the matter being one that had been handled in ordinary course by the men who are assigned to that particular work. I looked over the papers and concluded—

Q. "(Interposing) What did you find had been done up to that time? Had the application been accepted or rejected?

A. "I found in the regular course a proposal had

been submitted to the Southern Freight Association, asking approval of the adoption of a rate of $1.65.

Q. "What had been their ruling?

A. "There had been objection to that and it was not approved. The record, as I recall it, also showed that that proposition was subsequently amended to $1.75 and that had likewise been refused. I went carefully through the papers and probably conferred with Mr. Tierney. I don't remember the details particularly. After going over the matter I concluded that the proper rate to be adopted in there was $1.65 and, in accordance with the regular procedure, I prepared a letter and conferred with our vice-president, who is my superior, and concluded to exercise the option which we always reserve of independent action, and with the concurrence of the Norfolk Southern, I instructed the tariff be put in of $1.65.

Q. "Did Mr. Wight, or Mr. Freeman, or any of these people have anything to do with it at all?

A. "As I recall they had no conference with me. I have no recollection. What stands out in my mind is this conference with Mr. Shirley which caused me for the first time to go into the matter personally.

Q. "You and your vice-president had authority to over-rule the Southern Tariff Association?

A. "I would not put it that way. We always reserve the right of independent action.

Q. "Then, this was an independent action on a special rate brought about by the head of the Highway Commission having called it to your attention?

A. "Called it to my personal attention and I went into the matter personally for the first time then.

Q. "Have you the letter by which you put this into effect?

A. "I think my file has. Yes, sir; I have the letter before me.

Q. "Will you please read that into the record?

A. "(Reading) October 20, 1927. Mr. Charles Barham, chairman of Southern Freight Association, Atlanta, Georgia. Effective April 28, 1927, per Supplement 24 to Chesapeake and Ohio Railway's Virginia State Tariff No. 967-C, the Chesapeake and Ohio Railway Company established by independent action, for reasons set forth in our telegram to you of July 16, 1927, repeated per your joint letter A-8558 of July 18th, the rate of $1.65 per net ton on slag from Longdale, Virginia, and on crushed stone from Rocky Point, Indian Rock, and Eagle Mountain, to Norfolk Southern Railway stations on their southern route, to Virginia Beach group from Lynnhaven, Virginia, to Pungo, Virginia. On August 9, 1927, the Chesapeake and Ohio Railway filed its proposal 1110, your Supplemental No. 38618, to establish the same rate, $1.65, per net ton to Inlet and Ocean Park, Virginia, stations on the north branch of the Norfolk Southern Railway, to Virginia Beach, this branch paralleling the Southern Branch to the same point, upon which Lynnhaven, etc., is located. Addresses have been offered to the proposal simply, I understand, because the $1.65 rate to the other stations had not committee authorization. We cannot justify higher rates to points on the Norfolk Southern north division to Virginia Beach than effective to similar stations on the south route, and we are being pressed by interest shippers to determine the matter without further delay, with the alternative of complaint before the Virginia State Commission. We do not believe in the circumstances recited above that we could justify combination rates to Inlet and Ocean Park, Virginia, while contemporaneously maintaining

the rate of $1.65 to the other points mentioned. In conformity with Article 8 of the articles of association, please accept this as our notice of our purpose to establish the rates submitted in our proposal 1110, to which we have concurrence of the Norfolk Southern Railroad, effective on satisfactory notice.

Q. "Then, that rate was put in, as you say by you, in accordance with that letter on that date on the request of the head of the State Highway Commission, Mr. Shirley?

A. "Yes, sir; it was made effective by Supplement 28 to Virginia State Tariff 967-C, effective October 26, 1927."

The testimony of R. C. Wight, of the defendant company, in effect substantiates the testimony of witness Gilbert, from which we quote as follows:

Q. "Did the Highway Commission accept your proposal for the 13,600 tons of run of bank slag?

A. "They were in the air tentatively; said they probably could not handle it. In the meantime there came up a complaint of the owners of the sand banks down there that the dumping of that bank run slag in there would wash over their sand banks and damage it and they had a very strenuous complaint with the Highway Department. I went to see Mr. Shirley as soon as Mr. Tierney notified me that the rate had definitely been turned down and could not be gotten; and we discussed the matter of the bank run. He said: "Well, we can't handle that. We don't want that in there. It will not be of large enough material." I said: "Well, on this rate that is in here I cannot furnish you screened material at that price, I bid on the bank run material. I cannot furnish that at the prevailing rate." He said: "Can't you get a lower rate?" I said: "No, we have failed utterly. We have been

trying for a long time to get it and have just been notified by Mr. Tierney officially that it could not be gotten." I said: "Maybe you, with your position here with the State Highway Department, can have some influence around there to get them to put it in." He said: "Well, I will call Mr. Gilbert who is the head official around at the Chesapeake and Ohio." He said: "Mr. Gilbert is the general freight agent." I think he said he knew him. He called him up and had a talk with him and explained the situation to him. I saw Mr. Gilbert—

Q. "(Interposing) He bought a different kind of slag. He said he had to turn down your bid?

A. "Yes; said he did not want it.

Q. "He turned down your bid, the one you were talking to Mr. Freeman about?

A. "Yes, sir; he did not want that.

Q. "Now, the kind of material that he would be willing to take, you say, was what kind?

A. "Large lumps, no fine material in it at all, no dust.

Q. "Did you make a new contract with him for the new material if he could get the rate?

A. "I told Mr. Shirley if he could get the rate I could get a margin on that at $1.65 rate. While the margin was small, I would be willing to fill the order at that, but I could not do it on that rate."

\* \* \* \* \* \* \*

Q. "Did Mr. Freeman get this rate for you or not?

A. "He did not.

Q. "Were you able to get it yourself?

A. "I was not.

Q. "Was the contract or bid which you had put in ever carried out?

A. "It was not.

Q. "Mr. Freeman said that the whole idea of his conversation with you and your conversation with him was that you were going to save some money on a bid that you had put into the Highway Commission?

A. "He said he could make them put in that rate, which if he did, you know, would give me a margin of sixteen cents a ton more than the other rate, which I told him I would divide with him if we filled the order that we bid on.

Q. "But, by the Commission not accepting that bid, how did that change your situation? Explain that to the jury.

A. "Well, I had no order for slag run at all after they said they could not use it; I had no order. Then I took the matter up with Mr. Shirley at his request as to furnishing this lump material, what I could furnish that for." * * *

Q. "If you had gotten the contract and the rate had been put in for this run of bank slag, instead of making a margin of about ten cents a ton, you would have made a margin of ten plus eight, wouldn't you?

A. "I would have made more than that.

Q. "That would have given Mr. Freeman his eight cents too?

A. "I would have made twenty-six and I would have given him eight.

Q. "That you say never did go through?

A. "No, it did not.

Q. "When you made the new contract, the difference in price of the stuff more than absorbed the sixteen cents?

A. "Oh, yes."

The whole question to be determined is one of fact and in our opinion the uncontradicted evidence furnishes abundant warrant for the following conclusions:

1st. There was a failure of the agreement of August,

1927, on which the plaintiff's claim was based, because the bid of the defendant was never accepted by the Highway Commission. It rejected the material which was the subject of the agreement. This was through no fault of the defendant.

2nd. An entirely new and independent agreement was made between the defendant and the Highway Commission, which was the only agreement in contemplation which the Commission would entertain, and with this the plaintiff had no connection and which, incidentally, was of much less advantage to the defendant than the proposed agreement of August, 1927.

3rd. The evidence utterly fails to show that the plaintiff was the procuring cause of the change in the rate. His efforts in that behalf had been futile, and so far as the evidence shows had been abandoned. Nearly three months thereafter, the rate was changed by the mandate of the freight traffic manager of the Chesapeake and Ohio Railway, with the consent of the Norfolk and Southern Railway, at the instance of Chairman Shirley of the Highway Commission.

4th. That the evidence quite conclusively shows that H. G. Shirley, Chairman of the State Highway Commission, was the procuring cause of the change in the rate.

It follows, of course, that we find no error in the judgment of the trial court and therefore the same must be affirmed.

*Affirmed.*