The **FIDELITY AND CASUALTY COM-PANY OF NEW YORK**, Appellant,

v.

**Emmadean N. COMMANDER**,
Appellee.

No. 7128.

United States Court of Appeals
Fourth Circuit.

Argued March 21, 1956.
Decided April 9, 1956.

**348**

Horace G. Bass and R. Paul Sanford, Danville, Va. (Sanford & Clement, Danville, Va., on brief), for appellant.

Edwin B. Meade, Danville, Va. (Meade, Talbott & Tate, Danville, Va., and J. L. Williams, Danville, Va., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Emmadean Commander (hereinafter called the Beneficiary) filed a civil action against The Fidelity and Casualty Company of New York (hereinafter called the Insurer) in the United States District Court for the Western District of Virginia. The District Court entered summary judgment for $25,000 in favor of the Beneficiary and against the Insurer. The Insurer has duly appealed to us.

On Wednesday, July 8, 1953, Dr. J. C. Commander of Martinsville, Virginia, purchased a ticket from American Airlines at Newark Airport for an airplane trip on that date from Newark, New Jersey, to Provincetown, Massachusetts, with the trip from Newark to Boston by American Airlines, a change of planes in Boston, and with the trip from Boston to Provincetown by Provincetown-Bos-

ton Airline. The ticket shows that American Airlines collected $12.15 fare for the trip from Newark to Boston on its own line, Flight 332, and $7.82 fare for the trip from Boston to Provincetown on Provincetown-Boston Airlines, Flight 410, with the notation "Req." under the heading "Res. Status", meaning that a request was made to American Airlines to obtain space on the other airline for transportation to the destination indicated.

After purchasing his ticket, and before boarding the plane at Newark Airport, Dr. Commander made application to the Insurer through a machine at the airport for Airline Trip Insurance for $25,000.00 between Newark, New Jersey, and Provincetown, Massachusetts, and the Insurer issued to him through the machine the policy on which this suit is based, with Emmadean N. Commander as beneficiary.

Dr. Commander gave the policy to a friend, W. W. Walston, with instructions to deliver it to Mrs. Commander, his wife, if anything happened to him. Dr. Commander then departed on the plane of American Airlines for Boston and this flight was without incident. At Boston he boarded the plane of Provincetown-Boston Airline for Provincetown, but this plane developed engine trouble in flight, fell into the sea and submerged, near Provincetown, about a mile and a half from shore. The plane carried a pilot and three passengers; the pilot and one passenger were the only survivors. Dr. Commander was lost, presumably drowned, and his body has never been found. On July 8, 1953, Provincetown-Boston Airline was operated by John C. Van Arsdale d/b/a Cape Cod Flying Service, Provincetown, Massachusetts.

On the same day the news of the accident reached Martinsville, Virginia, by Associated Press. Emmadean N. Commander got the message in the afternoon from friends who had heard it over the radio. Dr. Sam Baldwin, an uncle of Dr. Commander, left for Provincetown on the night of July 8, arrived

in New York on July 9, where he joined W. W. Walston, and they went to Provincetown, talked to the Chief of Police, learned the details of the accident and that Dr. Commander's body had not been found. They returned to Martinsville on July 12 and reported to Mrs. Commander what they had learned. Walston went straight to Mrs. Commander's house upon his arrival and delivered to her the airplane accident policy which had been given to him by Dr. Commander. He told her what it was and that Dr. Commander had taken the policy out when he got on the plane, and that Dr. Commander had told Walston to give it to Mrs. Commander if anything should happen to him.

Mrs. Commander was prostrate with grief and shock at the news of the accident, a doctor was called early the following morning; he found she had not slept and gave her a sedative. Later that day, Dr. D. O. Baldwin, the insured's uncle, saw her and found her in a state of severe shock which continued for two or three weeks, and during this period he prescribed sedatives for her. Mrs. Commander testified she had sedatives given to her from time to time over a period of two weeks.

W. B. Muse, a real estate broker of Martinsville, handled all of Dr. Commander's insurance policies and rents from his rental property. He learned of Dr. Commander's death on July 8 and decided that a personal representative should be appointed to handle Insured's business affairs. He talked to Mrs. Commander about such an appointment but she did not consider it necessary as she did not believe Dr. Commander was dead for she had received no formal notification of his death. Muse told her the appointment would be null and void if Dr. Commander was found to be alive, and she agreed to the appointment. On July 10, 1953, Mrs. Commander went to the office of the Clerk of the Circuit Court for the City of Martinsville, with W. B. Muse and M. C. Martin of the First State Bank of Danville. They were met by J. L. Williams, Attorney, and Mrs. Commander made oath that Dr. Commander died on July 8, 1953; she requested the Clerk to appoint Muse and First State Bank as Administrators of his estate, which was accordingly done. Muse and J. L. Williams were then convinced that Dr. Commander was dead.

After the qualification, Mrs. Commander turned over to W. B. Muse her husband's papers, including various insurance policies. Muse testified that he put the insurance policies in his safe for safe keeping but the policies were payable to Mrs. Commander and were no concern of the Administrators. Mrs. Commander also turned over to Muse the airplane insurance policy which Walston had delivered to her.

Among Dr. Commander's life insurance policies were two with the Metropolitan Life Insurance Company. H. T. Dillon, Agent for this company, went several times to see Mrs. Commander after he learned of the accident and asked her to sign a death claimant's statement for the proceeds of the policy and she at first refused. Mr. Dillon told her it was necessary and the company would have to make an investigation before it could pay the claim. Mrs. Commander signed the claimant's statement for these policies around the 12th or 13th of August. Mr. Dillon was also convinced of Dr. Commander's death.

Despite the information which she had received about the accident and the failure to find her husband's body, Mrs. Commander testified that she was not entirely convinced that he was dead. Around the middle of August, she went to Provincetown with some members of her family but she obtained no additional information and she testified she was still not satisfied that her husband was dead. However, in an affidavit by her, which was filed, she stated that after completing her investigation she reached the conclusion that her husband died by drowning.

Shortly after her return from Provincetown, she employed J. L. Williams,

Attorney, on August 27, 1953, to represent her and to look after the life insurance and accident insurance policies. On the next day, W. B. Muse turned over to Mr. Williams the insurance policies and other papers, including the airplane accident policy. On September 1, 1953, Mr. Williams, as attorney for Mrs. Commander, wrote a letter to the Insurer, giving it notice of the accident and the death of Dr. Commander and asking for forms for filing proof of loss. This letter was received by the Insurer on September 4, 1953, but was not answered by the Insurer and Mr. Williams wrote again on September 16, 1953. The second letter was answered on September 30, 1953, by Associated Aviation Underwriters, the aviation department of the Insurer, asking for further information regarding the accident. The Insurer did not send the requested forms for filing proof of loss. Thereafter, there was correspondence between Mr. Williams and Associated Aviation Underwriters, about the accident and their investigation. On February 19, 1954, Associated Aviation Underwriters wrote to Mr. Williams stating that their investigation disclosed that Provincetown-Boston Airline was operated by Cape Cod Flying Service, which was owned by John C. Van Arsdale, and that Cape Cod Flying Service did not have a valid operating certificate on July 8, 1953, and for this reason and such other reasons as may appear, they had concluded that there was no coverage under the policy for the Boston-Provincetown leg of the flight on which Dr. Commander lost his life.

After this letter, there were negotiations by letter and personal conferences between Davis S. McLaughlin of Associated Aviation Underwriters, and attorneys for Mrs. Commander, regarding a compromise settlement of her claim under the accident insurance policy. These negotiations were not successful and this suit was brought. It is now admitted by counsel for both parties that Insured is now dead.

The policy in question contained the following provisions under coverages:

"This insurance shall apply only to such injuries sustained following the purchase by or for the Insured of a transportation ticket from, or the issuance of a pass by, a Scheduled Airline during any portion of the first one way or round airline trip covered by such transportation ticket or pass between the Point of Departure and the Destination shown above, in consequence of: (a) boarding, riding as a passenger in, alighting from or coming in contact with any aircraft operated on a regular or special or chartered flight by a Civilian Scheduled Airline maintaining regular, published schedules and licensed for interstate, intrastate or international transportation of passengers by the Governmental Authority having jurisdiction over Civil Aviation, or (b) while riding in or on a conveyance except a conveyance under the complete direction of the Insured, provided or arranged for, directly or indirectly, by such airline or the authority controlling an established airport, or (c) while in transit at any airport at which said aircraft stops, or (d) exposure as a result of forced landing or disappearance of or accident to such aircraft. If within one year after the date of such disappearance or accident the Insured's body has not been found, it shall be presumed that he suffered loss of life from accidental bodily injury covered by this policy and sustained at the time of such disappearance or accident."

There appears in bold face type at the bottom of pages 1 and 2 of the policy, the following:

"This Limited Policy Provides Payment for Loss of Life, Limb or Sight and Other Specified Losses by Accidental Bodily Injury While a Passenger on Civilian Scheduled Airlines and Other Specified Conveyances or While at an Airport in Transit, or Due to Exposure, to the Extent Herein Provided."

The District Court did not pass on coverage under Section (a) of the policy. Nor need we. Though the record is not entirely clear, it would seem that the airplane line from Boston to Provincetown has, previous to the accident here, been duly licensed by the federal authorities and that it was duly licensed after the accident. This defense of the Insurer is, therefore, to say the least, highly technical.

▉ On the score of coverage under Section (b) of the policy, the District Court stated in its opinion [135 F. Supp. 64]:

"Defendant contends that the insured was not included in Coverage (a) and that, construing the policy as a whole, the plaintiff is not entitled to recover under Coverage (b) because the two are inconsistent. I disagree. The policy provides five coverages, and they are in the disjunctive and not the conjunctive. It is my conclusion that plaintiff is entitled to recover if the accident which resulted in the insured's death falls within the ambit of any one of the coverages.

"It seems to me that this accident is clearly included within Coverage (b). I have found as a fact that the flight from Boston to Provincetown was arranged, directly or indirectly (I think directly), by American Airlines, and defendant contends that the airplane which undertook the flight from Boston to Provincetown was not a 'conveyance' within the meaning of the policy; that the word 'conveyance' as used in Coverage (b) should be construed to mean 'conveyance other than an airplane'. This seems to me to contravene the accepted rules for construing insurance policies. The policy was prepared by the defendant, and should be given a liberal construction. This rule was followed by Judge Groner in Gatewood v. Continental General Life Insurance Co., D.C., 23 F.2d 211, 213. In that

case, an unmounted saddle horse was held to be a 'conveyance'. The definition of 'conveyance' as 'anything which serves as a means or way of carrying something from one place to another, and as used in an insurance policy, means some vehicle or instrument other than the legs of a man walking and carrying his own body.' "

▉ With this we heartily agree. The two Sections of the policy, (a) and (b), apply each to an entirely different situation; they are separated by the disjunctive conjunction "or". There is one exception expressly stated in Section (b)—"except a conveyance under the complete direction of the Insured." The rule *expressio unius est exclusio alterius* favors our conclusion, together with the well known principle that ambiguities in insurance policies are construed against the insurer.

Here the policy, too, was purchased through a machine. We, accordingly, find no warrant for the contention of the Insurer that we should add to the policy after the word "conveyance" the further exceptive words "other than an airplane."

▉ This brings us to the question of notice, which gives us some concern. It is true that the giving of proper notice is a condition precedent to recovery under the policy. We might observe, however, that the Insurer was in no way prejudiced by the failure of the Beneficiary to give to the Insurer immediate notice of the accident. Further, failure of the Beneficiary to give notice to the Insurer was not set up by the Insurer as a defense during the negotiations for a possible settlement. Indeed, it seems that this defense appeared in this case for the first time in the answer filed by the Insurer in the instant civil action. The equities of the situation thus clearly favor the Beneficiary.

The policy contained the following provisions as to notice:

"4. Written notice of injury on which claim may be based must be

given to the Company within twenty days after the date of the accident causing such injury. In the event of accidental death immediate notice thereof must be given to the Company."

"5. Such notice given by or in behalf of the Insured or Beneficiary, as the case may be, to the Company at its General Office, 80 Maiden Lane, New York 8, N. Y. or to any authorized agent of the Company, with particulars sufficient to identify the Insured, shall be deemed to be notice to the Company. Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible."

"15. If any time limitation of this policy with respect to giving notice of claim or furnishing proof of loss is less than that permitted by the law of the State in which the Insured resides at the time this policy is issued, such limitation is hereby extended to agree with the minimum period permitted by such law."

Additional Provisions of the policy include the following:

"If this policy fails to conform to the statutes of the State wherein the policy is issued, this policy is hereby amended to conform to such statutes."

The policy was purchased in New Jersey. The New Jersey Statute, N.J.S.A. 17:38–3(15) of standard provisions required for health and accident insurance policies provides:

"15. If any time limitation of this policy with respect to giving notice of claim or furnishing proof of loss is less than that permitted by the law of the state in which the insured resides at the time this policy is issued, such limitation is hereby extended to agree with the minimum period permitted by such law."

This standard provision is set forth in Section 15 of the policy involved in this case.

New Jersey Statute, Section 17:38–13.2(B) (9) pertaining to elective policy provisions says:

"(9) A provision as follows:

"Conformity with State statutes: Any provision of this policy which, on its effective date, is in conflict with the statutes of the State in which the insured resides on such date is hereby amended to conform to the minimum requirements of such statutes."

■ It appears from the New Jersey Statutes and the policy provisions that the Virginia law is applicable on the question of notice in this case.

The Virginia Statute on "Required accident and sickness policy provisions", Section 38.1–349(5), enacted in 1952, provides as follows:

"(5) A provision as follows:

"Notice of Claim: Written notice of claim must be given to the insurer within twenty days after the occurrence or commencement of any loss covered by the policy, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the insured or the beneficiary to the insurer at .......... (insert the location of such office as the insurer may designate for the purpose), or to any authorized agent of the insurer, with information sufficient to identify the insured, shall be deemed notice to the insurer."

It is quite clear that notice of the accident was not given within the specific 20 days set out both in the Virginia Statute and in the policy, extended to conform with this Statute. The question then arises whether notice was given, under the provisions of the policy

and the Virginia Statute, as soon after the accident as was "reasonably possible."

The District Judge stated: "I have found as a fact that, under the circumstances, the notice was given as soon as was reasonably possible." This finding of fact we can overturn only if we hold that it is clearly erroneous. We cannot so hold. The circumstances of this case, set out in detail earlier in this opinion, make up a peculiar and distinctive pattern. Under that pattern, we must sustain this factual finding of the District Court.

We find it unnecessary to consider other questions discussed in the briefs of counsel. For the reasons hitherto stated, the judgment of the District Court is affirmed.

Affirmed.