253 F.2d 803
 Allen W. TIEDMAN and Victor Mercaldi (Victor Mercaldi having died during the pendency of this action and Anthony Mercaldi having qualified as Administrator of the Estate of Victor Mercaldi, deceased), Appellants,
v.
AMERICAN PIGMENT CORPORATION, Appellee.
 No. 7451.
 United States Court of Appeals Fourth Circuit.
 Argued October 10, 1957.
 Decided March 3, 1958.
 
 John M. Goldsmith, Radford, Va. (Robert S. Irons; Goldsmith & Irons, Radford, Va., and William J. Graham, on brief), for appellants. Howard C. Gilmer, Jr., Pulaski, Va. (Alex M. Harman, Jr., Pulaski, Va., on brief), for appellee.
 Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.
 SOBELOFF, Circuit Judge.
 
 
 1
 After an extensive trial the District Judge, sitting without a jury, dismissed the claim of the plaintiff, Allen W. Tiedman, against the American Pigment Corporation, on a contract of employment.
 
 
 2
 Tiedman's co-plaintiff, Mercaldi, had no participation in the events here reviewed, and joined in the suit as assignee of an interest in Tiedman's claim. The plaintiffs have appealed.
 
 
 3
 The contentions raised on the appeal are that the Court erred in its decision upon the merits and in denying certain of the plaintiffs' requests for the inspection of documents and premises in defendant's possession.
 
 
 4
 In 1941, and for some years earlier, the defendant had been engaged at Pulaski, Virginia, in manufacturing natural iron pigments from raw materials which it mined nearby. It had also been buying synthetic iron oxides, known as ferrites, from Northern Pigment Company, of Toronto, Canada, particularly two shades designated by Northern as Nos. 300 and 307. As the patents on processes for manufacturing synthetic iron oxides had expired in 1938, they were rapidly replacing natural materials which had theretofore been imported from abroad to tint mined pigments used in paint making. American Pigment's chemist had, before entering military service, succeeded in producing in its laboratory only small quantities of synthetic iron oxides. The company had not produced them commercially and had no facilities for their large scale production. It was desirous, however, of entering that branch of the industry.
 
 
 5
 In the fall of 1941, American Pigment Corporation learned that Tiedman, plant manager of the Northern Pigment Company, was available for employment. After negotiations, American and Tiedman entered into a contract dated January 10, 1942, for his employment for a period of ten years, renewable for additional periods up to forty years. The defendant agreed to set up facilities in accordance with Tiedman's advice and assistance, and the latter promised to serve the former "with all of the knowledge and skill at his command in the manufacture of synthetic oxides." He further agreed "to reveal the secrets and methods in toto known to him or that may become known to him in the manufacture or process of synthetic iron oxides during the term of his employment." Specifically he agreed that he could and would manufacture synthetic iron oxides of a quality equal or superior to "Northern pigments Nos. 300 and 307."
 
 
 6
 In addition to an agreed salary, Tiedman was promised a "royalty" of two dollars per ton on all synthetic iron oxides manufactured. The royalty was to be paid, irrespective of the duration of the employment, to Tiedman and his heirs, etc., during his lifetime and for a period of fifty years after his death.
 
 
 7
 Commercial production of synthetic iron oxides began at Pulaski in August, 1942, but according to the defendant, the product did not measure up to the standards of the trade or of competing products, particularly Northern's Nos. 300 and 307, as promised in the contract. Tiedman, however, testifying as a witness, insisted that such failures as occurred were due either to the strain of wartime conditions or to breaches of the defendant's contractual duty to supply him proper facilities and labor; that while there had been some differences between him and his employers, they had made no major complaints against him; and that the company abruptly fired him on November 19, 1945.
 
 
 8
 Emphatically, he testified that he had disclosed fully and in good faith all secrets and methods known to him regarding the manufacture of synthetic iron oxides, as required by the contract, and that if the employers were unable to practice the art, it was not because he withheld anything, but because deficient training limited their ability fully to utilize the disclosures made to them. He asserted, however, that the company had actually been successful as a result of the "know how" skills, and methods he communicated to its employees; that American had suffered no losses; that all of its product was absorbed by the market or used by the defendant. The response of the defendant was that much that was disposed of in wartime was inferior to the standard promised by Tiedman and could not possibly have satisfied normal requirements.
 
 
 9
 The testimony presents irreconcilable conflicts, which need not be further elaborated. It raises essentially issues of credibility, and the case illustrates the reason for the rule (No. 52, F.R.C.P., 28 U.S.C.A.) requiring appellate courts to give due regard to the trial court's opportunity, which is denied them, to see and hear the witnesses, and to accept findings of fact unless convinced that they are clearly erroneous.
 
 
 10
 The Judge's findings determined the facts substantially as contended by the defendant. He found that the plant was erected in accordance with Tiedman's directions as to layout, selection and installation of machinery and equipment, and that Tiedman made no complaint then as to the plant or its equipment.
 
 
 11
 The Judge's opinion points out that Tiedman failed to install equipment that had been furnished at his instance, and that he permitted it to lie idle during the entire period of his employment.
 
 
 12
 The District Judge concluded that according to the weight of the credible evidence, Tiedman did not as a rule during the three years of his employment succeed in producing a product of the required standards of quality to meet the competition of the market. There was also an explicit finding that Tiedman did not perform his obligation to impart his knowledge or skill and to disclose his methods to anyone connected with the defendant. On the contrary, the Court was convinced that Tiedman studiously avoided passing on information to those employees who did possess sufficient training to utilize it in the production of the required product independently of Tiedman; that he hoarded his secret knowledge, persistently rejecting the company's suggestions for the employment of a trained assistant to whom he could impart his methods and secrets. There was evidence that Tiedman boasted of driving away the company's general manager for "nosing in my business."
 
 
 13
 The circumstances under which Tiedman's employment ended were minutely inquired into in the District Court. They are enlightening on the questions of credibility in other aspects of the testimony, and obviously were given consideration by the Judge.
 
 
 14
 Over a considerable period the defendant had been seeking a method of producing synthetic sienna. By the summer of 1945, with Tiedman's assistance, it believed that it had achieved a patentable process. A contract was prepared for assignment by Tiedman to the company of any patent that might be granted, upon payment of certain cash considerations. Tiedman declined to execute the contract without first seeking advice from Mr. Constable, his father-in-law, an attorney in Toronto. For this declared purpose, Tiedman left Pulaski October 4, 1945.
 
 
 15
 It appears from testimony offered by the defendant that as Tiedman was expected to return in about a week, an appointment was arranged for him for October 15, to meet a Mr. Garrett, a mechanical engineer who had recently been discharged from military service and was under consideration for employment as an assistant to Tiedman. Asked on cross examination why he did not return for this interview, Tiedman replied he had no such appointment "that [he] knew of."
 
 
 16
 About the 15th of October, Mr. Tiedman, instead of returning to Pulaski, wired from White Plains, New York, to his secretary at the plant, without disclosing where he could be reached, requesting her to deposit his semi-monthly salary in his bank account.
 
 
 17
 There was no further communication from Tiedman, but on November 13, 1945, his father-in-law as his attorney, wrote the defendant's attorney advising that Tiedman had consulted him "about four weeks ago" concerning their contract and that "as I did not hear from him I left the matter in abeyance." Mr. Constable's letter also announced to the defendant, "It now appears that Mr. Tiedman remained over in New York to look after certain interests and in the belief that he was entitled to a reasonable vacation." Mr. Constable suggested that the defendant forward to Mr. Tiedman his salary for one month by way of vacation "on his undertaking to return at once to the company for further instructions." He added that he did not know Mr. Tiedman's address in New York but that a communication would reach him if sent in care of Miss Constable, a daughter of the writer and a sister of Mrs. Tiedman, at a given address in White Plains, New York.
 
 
 18
 Defendant's attorneys promptly informed Mr. Constable that their client was unwilling to make the requested advance, and on November 19, wrote Mr. Constable, recounting the circumstances of plaintiff's departure on October 4, and his failure to return. They also recited the defendant's version of its disagreements with Tiedman and his alleged failures in his duty under the contract, and gave notice of termination of the contract of employment. The company addressed a letter to Tiedman at his Pulaski apartment, instructing him not to visit the ferrite plant until he had conferred with its Executive Vice-President.
 
 
 19
 Tiedman did return to Pulaski later in November and was requested to attend a conference with company officials at its attorney's office. He put in an appearance at the designated time and place but declined to remain for the conference and walked out. He testified that when he left on October 4, he intended to return, but that he was summarily dismissed.
 
 
 20
 The District Judge found that Tiedman abandoned his job on October 4, 1945, disrupting the defendant's operations. The defendant made diligent effort to overcome these handicaps and to produce synthetic oxide. Not until the government made available to the defendant information obtained from German sources after the war, was the defendant's problem solved.
 
 
 21
 For several years defendant heard nothing from Tiedman. His first claim against it was asserted in a letter dated May 3, 1948, demanding royalties on the theory that it was continuing to use methods disclosed by him. Defendant denied the assertion and the claim. Then followed another silence of four years. Tiedman filed suit in August, 1952, nearly seven years after the termination of his employment.
 
 
 22
 An examination of the record discloses ample support for each of the findings of fact, and an appellate court would not be warranted in upsetting such findings unless convinced that the trial Judge was clearly erroneous. Rule 52, F.R.C.P. (28 U.S.C.A.). Our study of the record leaves us with no such conviction; we think on the contrary that the facts were correctly found. See: Walling v. General Industries Co., 1947, 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088; Banks v. Siegel, 4 Cir., 1950, 181 F.2d 309; Fidelity and Casualty Company of New York v. Commander, 4 Cir., 1956, 231 F.2d 347.
 
 
 23
 The plaintiff's contention that any failures in the quality of the product for which Tiedman was accountable were waived by the defendant, requires no extended discussion. A laudatory letter written by the defendant company in April, 1943, a few months after the plant was built but two and one-half years before Tiedman's services were terminated, was much relied on by him to show the company's satisfaction with his performance, or waiver of any default.
 
 
 24
 A default unquestionably may be waived, but where the performance due is of a continuing nature, the promisee need not at once terminate the agreement. If he brings home to the promisor the complaints registered against the promisor's product, and if he continues the relationship on the assurance of better future performance, he is not barred from asserting his rights. In such a case, the successive acceptances of the defective performance would not justify the belief that performance of the character tendered was satisfactory to the promisee, and a waiver of the right to the promised performance cannot be found. See: 3 Williston, Contracts (Rev.Ed., 1936), Sec. 741, p. 2100, et seq.; Restatement, Contracts, Secs. 297, 300 (cf. Ill.B., Sec. 300); Cf. 3 Corbin, Contracts (1951), Sec. 755, p. 918; Smith's Ex'x v. Profitt's Adm'x, 1887, 82 Va. 832, 1 S.E. 67; Gibney & Co. v. Arlington Brewery Co., 1911, 112 Va. 117, 70 S.E. 485, 487; Orr Felt, etc., Co. v. Sherwin Wool Co., 1924, 248 Mass. 553, 143 N.E. 541; Conoco Oil Co. v. Union Oil Co., 6 Cir., 1936, 83 F.2d 491; Hein v. Fox, 1953, 126 Mont. 514, 254 P.2d 1076; National School Studios v. Mealey, 1956, 211 Md. 116, 126 A.2d 588; Welsh v. Hume, La.App. 1956, 86 So.2d 236.
 
 
 25
 The plaintiff has not performed the basic conditions precedent to the defendant's obligation to pay royalties. The contract expressly provides that the manufacture by Tiedman of synthetic iron oxides of a quality equal to or superior to the Northern pigments Nos. 300 and 307 is "a condition precedent herein." Also, performance of Tiedman's promise to reveal his secrets and methods is a constructive condition precedent to the defendant's obligation to pay royalties after Tiedman's employment ceased. And so, for the breach of both the express and constructive conditions, the defendant's obligation to pay the royalties never arose, and plaintiffs' claim as to them must fail. 3 Williston, Contracts (Rev.Ed., 1936), Sec. 829, p. 2318, et seq.; Restatement, Contracts, Secs. 269, 270. See also, Restatement, Contracts, Sec. 250; Freeman Stone & Gravel Co. v. Wight & Co., 1930, 154 Va. 306, 153 S.E. 701; 3 Corbin, Contracts (1951), Sec. 657, p. 621, Sec. 676, p. 672.
 
 II
 
 26
 Tiedman moved, under rule 34 (28 U.S.C.A.), for an order directing the defendant to permit him to examine all of its books, records, and communications, "in any way pertaining to the contract between the plaintiff and the defendant * * * or to the operations of defendant under said contract from December, 1941, to date," or "in any way pertaining to the business relations between the plaintiff and the defendant from December, 1941, to date." Tiedman also sought permission to enter the defendant's plant to inspect, measure, survey, or photograph "the land, the plant, facilities, and all equipment * * in any manner related" to the production of synthetic iron oxides.
 
 
 27
 The District Judge denied each request, except that he permitted an accountant to determine the volume of defendant's sales of synthetic iron oxides. The plaintiffs contend that denial of the rest was reversible error. We disagree.
 
 
 28
 It is, of course, true that a trial is not a sporting event, and discovery is founded upon the policy that the search for truth should be aided. Comercio E Industria Continental, S.A. v. Dresser Industries, Inc., D.C.N.Y. 1956, 19 F.R.D. 513; Rule 34 is, therefore, to be liberally construed. June v. George C. Peterson Co., 7 Cir., 1946, 155 F.2d 963; Karlsson v. Wolfson, D. C.Minn.1956, 18 F.R.D. 474. An appellate court does not, however, decide whether it would, in the first instance, have permitted the discovery prayed for.
 
 
 29
 Granting or denying a request under rule 34 is a matter within the trial court's discretion, and it will be reversed only if the action taken was improvident and affected substantial rights. Carter v. Baltimore & O. R. Co., 1945, 80 U.S.App.D.C. 257, 152 F.2d 129, 130; Atlantic Greyhound Corporation v. Lauritzen, 6 Cir., 1950, 182 F.2d 540; Sher v. DeHaven, 1952, 91 U.S. App.D.C. 257, 197 F.2d 777, 781, 36 A. L.R.2d 937; Bank of America National Trust & Savings Ass'n v. Hayden, 9 Cir., 1956, 231 F.2d 595, 606; 2 Barron & Holtzoff (1950), Sec. 803, p. 526.
 
 
 30
 Tiedman made no effort, either in his motion or by affidavit, to show good cause, as required by the rule, for the production of the records and documents, or the proposed inspection of the plant. Martin v. Capital Transit Co., 1948, 83 U.S.App.D.C. 239, 170 F.2d 811, 814; United Mercantile Agencies v. Silver Fleet Motor Express, D.C.Ky.1941, 1 F.R.D. 709. See: Victory v. Manning, 3 Cir., 1942, 128 F.2d 415. Seven years were permitted to elapse after he had left the defendant's employ before he filed his suit and the motion. In the meantime, doubtless, changes had been made in the plant. Because of the competitive nature of the pigment industry, the defendant sought to keep secret from him improvements which it had developed.
 
 
 31
 Recognizing the extensive scope of the production and inspection which his motion called for, plaintiff, upon denial of his motion, stated that he might want to renew it later to meet some of the objections that the court raised, "particularly that of generality." See: 4 Moore, Federal Practice (1950), Sec. 34.07, p. 2442 et seq., Consolidated Rendering Co. v. State of Vermont, 1908, 207 U.S. 541, 28 S.Ct. 178, 52 L.Ed. 327; Brown v. United States, 1928, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500. This the plaintiff never did. See: Bank of America National Trust & Savings Ass'n v. Hayden, 9 Cir., 1956, 231 F.2d 595, 605. Seemingly abandoning his motion under rule 34, Tiedman utilized the deposition procedure under rule 26 (28 U.S.C.A.) to question the defendant's employees, and also availed himself of subpoena duces tecum under rule 45 (28 U.S.C.A.) both of which are in pari materia to rule 34. 4 Moore, Federal Practice (1950), Sec. 34.02, p. 2424; U. S. v. Schine Chain Theatres, D.C. N.Y.1942, 2 F.R.D. 425; North v. Lehigh Valley Transit Co., D.C.Pa.1950, 10 F.R.D. 38. His motion under rule 34 was not further pressed in the two years before trial, and the matter is raised on appeal apparently as an afterthought.
 
 
 32
 We cannot say that the action of the trial court was in the circumstances so improvident as to amount to an abuse of discretion or that plaintiff's substantial rights were prejudicially affected. See: Sher v. DeHaven, 1952, 91 U.S.App.D.C. 257, 199 F.2d 777, 781, 36 A.L.R.2d 937; Lever Bros. Co. v. Proctor & Gamble Mfg. Co., D.C.Md. 1941, 38 F.Supp. 680; Michel v. Meier, D.C.W.D.Pa.1948, 8 F.R.D. 464, 476; Kurt M. Jachmann Co. v. Marine Office of America, D.C.S.D.N.Y.1955, 17 F.R.D. 41, 42; Cf. Paramount Film Distributing Corp. v. Ram, D.C.E.D.S.C.1950, 91 F.Supp. 778; Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 1942, 130 F.2d 1016; 2 Barron & Holtzoff (1950), Sec. 799, p. 514.
 
 
 33
 The judgment of the District Court must therefore be
 
 
 34
 Affirmed.