### In re LORAZEPAM & CLORAZE-PATE ANTITRUST LITIGA-TION

**This document relates to: Health Care Service Corporation, Plaintiff,**

v.

**Mylan Laboratories, Inc., et al., Defendants,**

and

**Blue Cross Blue Shield of Minnesota, et al., Plaintiffs,**

v.

**Mylan Laboratories, Inc., et al., Defendants.**

No. MDL NO. 1290.
Nos. MISC.NO.99–276(TFH/JMF), 01–2646(TFH/JMF).

United States District Court, District of Columbia.

Jan. 16, 2004.

See also 219 F.R.D. 12.

David T. Fischer, Robert T. Rhoad, Porter, Wright, Morris & Arthur, Eric Sean Jackson, Thomas Joseph Poulin, Robins, Kaplan, Miller & Ciresi, L.L.P., Washington, DC, for Plaintiffs.

Brian S. Roman, George H. Crompton, Ryan James, DKW Law Group, PC, Pittsburgh, PA, Joseph Anthony Hynds, Rothwell, Figg, Ernst & Manbeck, Peter M. Todaro, King & Spalding, Washington, DC, Jonathan R. Tuttle, Debevoise & Plimpton (NY), New York, NY, Lisa R. Fine, Weil, Gotshal & Manges, L.L.P., Washington, DC, for Defendants.

## Opinion

FACCIOLA, United States Magistrate Judge.

## INTRODUCTION

Plaintiffs are Blue Cross Blue Shield of Minnesota and of Massachusetts, the Federated Mutual Insurance Company, and the Health Care Service Corporation (hereafter collectively called "the Blues"). They opted out of a settlement, premised on antitrust violations by the defendant, Mylan Laboratories (hereafter "Mylan"), and their complaint has now survived Mylan's motion to dismiss.

## BACKGROUND

In the complaint filed on December 22, 1998, ten states and the Federal Trade Commission charged the defendants with entering into illegal agreements to monopolize the markets for the generic anti-anxiety drugs, lorazepam and clorazepate.[1]

### The "Scandalous" Allegations

The Blues filed their own complaint alleging that (1) patients were endangering their health by being forced to forego the lorazepam and clorazepate they needed, and (2) Mylan employees were engaging in "insider trading." Mylan also protested that the complaint contained "inflammatory media sound bites." Mylan moved to strike these allegations as immaterial but the Blues insisted that "each of the allegations is necessary to demonstrate the nature and scope of Defendants' scheme to drive up the prices for Lorazepam and Clorazepate which anti-competitive scheme resulted in direct injury to Plaintiffs." *Memorandum Opinion* of Oct. 4, 2002, quoting *Plaintiffs Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Massachusetts and Federated Mutual Insurance Company's Memorandum of Points and Authorities in Opposition to Defendants Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc.'s Motion to Strike Portions of Plaintiffs' Second Amended Complaint* ("Pls' Opp.") at 2.

In the Opinion just quoted, Chief Judge Hogan denied Mylan's motion. Noting that motions to strike are so disfavored that courts require a showing that the material to be stricken is immaterial and prejudicial or scandalous, the Chief Judge carefully concluded:

---

1. *See generally FTC v. Mylan Laboratories, Inc.,* 62 F.Supp.2d 25 (D.D.C.1999).

[W]hile by no means having reached a decision on the merits of this case, the Court finds that the paragraphs in question may very well be relevant to Plaintiffs' ability to establish that an antitrust violation has occurred under pertinent state laws.

*Id.* at 3–4.

## The Blues Are Not Entitled to Insider Trading Information

The Blues read Judge Hogan's statement as an endorsement of their theory that learning about Mylan's insider trading is relevant to their claims and defenses. They, therefore, have demanded all documents "during the relevant time period" related to insider stock ownership or transfers of interest. More specifically, they want documents (broadly defined) pertaining to (1) the adoption by Mylan's Board of Directors of a 1997 Incentive Stock Option Plan, (2) the exercise of options from January 1996 to the present, and (3) Mylan Insider Trading Policies and communications relating to stock ownership or purchases from January 1996 to the present.

I first find the Blues's interpretation of the Chief Judge's October 4, 2002 order as expressly authorizing this kind of search to be a stretch. The Chief Judge was dealing with several allegations in the Second Amended Complaint, including allegations about insider trading that were claimed to be "prejudicial or scandalous." His determination that all of these allegations were neither prejudicial nor scandalous is hardly a ringing endorsement of the theory that insider trading in 2004 has something to do with a lawsuit predicated on events that occurred in the winter of 1997–1998. Because the question of whether the information sought is relevant to any claim or defense under Fed.R.Civ.P. 26 is open, I have considered it and will resolve it against plaintiffs.

Interestingly, there is a Third Circuit opinion that deals with insider trading in Mylan stock that occurred contemporaneously with the price increases at issue in this case and the FTC investigation that led to this lawsuit. *Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594 (3d Cir.2000). In that decision, the court indicated that Mylan entered into "agreements with Profarmco and Gyma that gave it exclusive access" to the raw materials used to manufacture lorazepam and chlorazepate in November 1997. *Id.* at 596. Mylan raised its prices on chlorazepate on Janaury 12, 1998 and its prices on lorazepam on March 3, 1998. By June 19, 1998, Mylan was reporting to the SEC that its revenues had increased 37% and its net earnings 132%. *Id.* On July 4, 1998, however, Mylan had to report to the SEC that the FTC was investigating whether the price increases were the result of a restraint of trade. *Id.* According to the Third Circuit, this report depressed the price of Mylan stock. *Id.*

It would, therefore, appear that a Mylan insider who knew what the market did not-that Mylan was going to increase its prices and thereby gain more revenue-had a window of opportunity to exploit this insider information from November 1997, the date Mylan entered into agreements with Profarmco and Gyma, until the price increases in January and March 1998. Once the world knew what the insider did-that substantial price increases in a market Mylan dominated would increase revenue and enhance stock prices-the playing field was level and the insider would gain nothing from the information he had. Given this brief window of opportunity, the Blues's demand for insider trading "to the present," *i.e.*, January 2004, is fatally overbroad. I appreciate that the Blues want to compare insider trading in what I would

call the insider's widow of opportunity with insider trading thereafter. But, what would that comparison prove? That insiders traded more at one point and traded less at another proves nothing. The price of a commodity is a function of supply and demand and the price of a stock may be affected by the general demand for stocks as opposed to bonds and other investments. In a bear market, all stock prices are depressed save for those few contrarian stocks that buck the market trend. Knowing that several Mylan insiders bought Mylan stock before the price increases but that other Mylan insiders sold it when the entire market became bearish proves absolutely nothing except the obvious-those who play the market try to buy low and sell high and, on occasion, cut their losses. To derive some conclusion from the economic behavior of Mylan insiders in 1997–1998 compared with their behavior at a later point in time, when so many variables are affecting that behavior, is akin to drawing some vast conclusion about apples and oranges because they are both spherical.

Finally, the Blues's burden in this case is to show that Mylan's price increases were the result of a restraint of trade and that they were damaged thereby. Taking the Blues's best case, that the insiders knew the increases were illegal and were nevertheless trying to profit from them, does not make it any more likely that the agreements were in restraint of trade nor does it bear on whether the Blues were damaged.

I will, therefore, deny the Blues's motion to compel.

## The Indexing Problem

At the end of this monumental anti-trust case, the remaining parties have reached an impasse on what is a remarkably fundamental issue for a case that has such a protracted history. Mylan, the defendant, has responded to the discovery demands of the many parties that sued it. Understandably, that production generated what appears to be a mountain of information. Some of it is in electronic form, and some of it is in hard copy. The Blues propounded discovery of their own and Mylan responded by indicating that the documents sought had already been produced in the discovery given the other plaintiffs and that it had already been made available to the Blues. The Blues claim that although they finally got an index to paper documents and CD–ROM's on November 19, 2003, it is utterly insufficient and Mylan owes them a "meaningful and detailed document index." [2] Mylan says that the Blues have to do their own work and look diligently at what they have been provided and that Mylan has no further obligation now that Mylan has provided everything that could possibly be responsive to the Blues's discovery demands.

As an example of the problem, the Blues believe that there are documents pertaining to a specific managed care department within Mylan and to a "white paper" written about the impact of Mylan's actions on managed care entities. Mylan says that everything it has responsive to that request is in the discovery it has provided the Blues and if they cannot find it it does not exist. The Blues protest that an unindexed, document "dump" does not meet Mylan's obligation to match documents

---

**2.** *Plaintiffs Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Massachusetts, Federated Mutual Insurance Company, and Health Care Service Corporation's Joint Reply*

*Memorandum in Support of Plaintiffs' Joint Motion to Compel Discovery from Defendants* at 10.

with discovery requests as specifically as possible.

At the discovery conference held in October 2003, I saw this problem coming and strongly urged the parties to use their creative imaginations to see how the prior discovery responses could be rendered mutually searchable by electronic means. Their pleadings reflect, however, that they did not do so. Hence, the rock remains at the bottom of the hill, exactly where it was in October.

I hope the parties appreciate that this problem is insoluble. I also have to hope that they are not expecting me to go through all the discovery that has been provided to test the *bona fides* of Mylan's representation that everything the Blues want is already there. I only have two years left in my term, and discovery ends in approximately one month.

I think, however, that there may a light at the end of the tunnel. I have listened to the tape recording of the status conference recently held before the Chief Judge and, as I understand the present situation, the Blues recently examined the 40 boxes of documents that were at Hogan & Hartson and will receive copies of the documents they designated. I also understand that they will receive copies of two boxes of documents currently in the possession of a law firm called DKW. It would appear, then, that the Blues, having taken what they want from these 42 boxes, do not need an index to their contents.

That leaves the CD–ROM's. Again, as I understand the situation, the Blues are protesting that the information on them is not readable. But, if it can be made readable and, more importantly, searchable by the Blues, there is no need for an index of them. To the contrary, the Blues can then search the documents on their own, regardless of any index produced by Mylan. The glory of electronic information is not merely that it saves space but that it permits the computer to search for words or "strings" of text in seconds. The Blues can, for example, look for the White Paper they insist exists by searching for the word "white" within a certain number of words from the word "paper," thus replicating for themselves the search done several years ago by a computer forensic scientist. In this sense, the presence of the information on the CD–ROM's is an opportunity for the Blues rather than a problem.

I have now decided to require the Blues to do what I had hoped the parties would consider doing last October-ascertaining whether the CD–ROM's can be rendered searchable by the Blues. I will not take any action on this aspect of the Blues's motion to compel until they first make the 23 CD–ROM's available to a company that specializes in computer forensics or electronic discovery to ascertain whether the information on the 23 CD–ROM's can be either read and searched by a commercially available software or whether it can be converted to a format that will render it capable of being read and searched by commercially available software. The Blues will then have to report to me within one week of the date of this opinion about what they found, and we shall proceed from there. If, as I hope, the information on the CD–ROM's can be rendered readable and searchable quickly and cheaply, I expect that the problem of indexing the documents will be a non-issue. If the cost is great, I will still consider having it done, but I will hear from the parties as to whether the cost should be allocated or shared.

Should any additional issues arise, I will resolve them following oral argument.

**SO ORDERED.**